16-2907 People vs. James Hudson Emerald Council, please approach. And identify yourself for us and tell us who you represent. My name is Katie Anderson, and on behalf of the state of Boulder Thunder, I represent Mr. James Hudson. Good morning, Your Honors. Assistant State's Attorney Joseph Alexander on behalf of the people of the state of Illinois. All right, and Ms. Anderson, how much time would you like this morning? I plan to reserve three minutes for the ball. Okay, and your opening argument? It will be 17. Okay. Okay, and Mr. Alexander? I'm anticipating approximately 15 minutes. Okay, great. All right, and Mr. Alexander, please have a seat, and Ms. Anderson, whenever you're ready. Thank you, Your Honor. May it please the Court. My name is Katie Anderson, and on behalf of the State Appellate Defender, I represent Mr. James Hudson. This Court should reverse Mr. Hudson's conviction. Can you keep your voice up? You're soft-spoken. I'm hard of hearing, so. Oh, I apologize. Okay. This Court should reverse Mr. Hudson's conviction because the trial court proceedings below were riddled with error that infected almost every stage of Mr. Hudson's trial, from motions in limine all the way through closing argument and jury instructions, and as such, Mr. Hudson did not receive a fair trial. I will begin with the most inculpatory piece of evidence, which was Lieutenant Bailey's identification of Mr. Hudson as the offender. This is Issue 3 in the briefs. The State has conceded that this identification was admitted without adherence to the safeguards mandated by the Illinois Supreme Court and People v. Thompson when the State is introducing law enforcement officer identification testimony, but maintains that this is harmless error. However, this most certainly is not harmless error for several reasons. First, Bailey's identification of Mr. Hudson goes directly to the main issue at trial, which is the identity of the offender. The State's brief concedes the significance of Bailey's testimony, which it characterizes as, quote, necessary to help the jury resolve an issue of fact, end quote. Yet, the State also argues that admission of the same testimony is harmless because the evidence against Mr. Hudson is, quote, overwhelming, end quote. It's completely contradictory to argue that this exact same evidence is both necessary to the State's case, but that its admission at trial is also somehow harmless error. And the State's own characterization of this evidence as necessary demonstrates that its admission cannot be harmless. Well, but you're not suggesting that Mr. Bailey, who lived down the street from the defendant for several years, had seen him not as a law enforcement officer but as a neighbor, was somehow disqualified from testifying that I saw this video and I saw the stills from the video and I know that person, just like any other member of the public could say, right? Well, while it is true that Mr. Bailey knew Mr. Hudson, there were still a couple issues with the admission of his testimony. First, while we do know that Mr. Bailey did live next door to Mr. Hudson, I think it's important to keep in mind that that was when Mr. Hudson basically was a kid. This was significantly before the case took place. And while we know that Mr. Bailey had seen Mr. Hudson since then 50-plus times, I think he said, that's really all we know. We don't know anything about the nature, the quality, or the duration of these contacts. For example, we don't know – Counsel, those were excluded at some point before the trial, the reasons why Lieutenant Bailey knew this defendant were kept out of the trial on purpose. That is correct. So you're saying we don't know them, they're not on the record, but at the trial, the trial counsel and the public defender and the judge certainly knew. Yes, that is correct. But the jury did not know. The jury knew very little about Mr. Bailey's relationship with Mr. Hudson. And also, defense counsel was not really able to do a meaningful cross-examination of this. So when we look at Bailey's identification in the first place, we need to remember that this initial identification was based off a video still. It was based off a video still of a person with a mask on. And the still was of such poor quality that when Bailey testified, he couldn't say whether the print was black and white or in color. So we're dealing with a really grainy photograph that Bailey identified Hudson from initially. So that is kind of very important to keep in mind. This guy is his former neighbor, and he's claiming that all of these years later, he's able to look at this really grainy video still. I don't know if you've had the opportunity to review the exhibits in the case. But the still is really not very clear. So it's kind of remarkable in the first place that Bailey was able to identify Hudson off of this based on the quality of the photo. Which also brings us to another important point regarding the necessity of Bailey's testimony. The state introduced Bailey's testimony so that he could identify Mr. Hudson as the man on the video still for the jury. But Mr. Hudson was sitting at that defense table in front of the jury for several days. So if it was really so clear that Mr. Hudson was the person on the video still, the state wouldn't have needed Bailey to connect the dots. But they did because of the poor quality of both the still and the video. And I think it's really important to keep that in mind when we are reviewing this evidence in the case here. Also, the cross-examination at trial that defense counsel did was really short. Defense counsel clearly went into this with very little of an understanding of what Bailey was going to say. The only thing defense counsel really knew was that Bailey used to be Hudson's neighbor and that Bailey had seen Hudson about 50 times over the last 15 years in his capacity as a police officer. So defense counsel was really hesitant to cross-examine Lieutenant Bailey about this identification. And what would the procedure the court advocated in Thompson have added to counsel's ability to effectively cross-examine Officer Bailey? Well, I'm sorry. I didn't mean to cut you off there. That's a really good question. Because in this case, it really would have added a lot to the case and defense counsel's ability to be an effective advocate here. So under Thompson, before the law enforcement officer identifies the defendant as the person in the surveillance video in front of the jury, there's supposed to be a cross-examination outside of the presence of the jury to give defense counsel an opportunity to explore areas that might elicit poor and bad information on cross so that the counsel can make a more informed strategic decision during the cross-examination in front of the jury. In this case specifically, it would have been really helpful for defense counsel to be able to ask Mr. Bailey more about the circumstances under which he had seen Mr. Hudson. For example, we don't know if he saw him 50 times in passing or if they had a long sit-down conversation the week before. Also, realistically, had there been this hearing off the record and the 50 plus times that Officer Bailey saw Mr. Hudson were in his capacity as a police officer, how likely is it that defense counsel would have wanted to explore the details of that? See, that's exactly the point. We're all sitting here making all of these negative assumptions about the fact that Mr. Bailey saw Mr. Hudson 50 times in his capacity as an officer. But we don't know what that means. Bailey could have been on patrol and happened to come across Hudson 50 times while he's on patrol. That's certainly within his capacity as a police officer, but there's no negative inference to be drawn from that fact. So if Lieutenant Bailey has happened to come across Mr. Hudson 50 times while he's on patrol, that is certainly very different than let's say maybe he has arrested Mr. Hudson 50 times and questioned him at the police station. We know that's not true based on the information in the PSI, but that's just to kind of show the wide range of inferences that the jury could be drawing here. And just like Your Honor immediately drew a negative inference while he saw him 50 times in his capacity as a law enforcement officer, so no good information can come out of that, that's exactly the point. And that's exactly why we need to have the opportunity to cross outside of the presence of the jury. Another thing that is particular to this case is one of the issues in its closing argument, the State argued that Holliday did not identify Mr. Hudson in the photo array because the photo array pictures were old and that his appearance had changed over the years. If defense counsel had the opportunity to cross-examine Mr. Bailey outside of the presence of the jury, this would have been a particularly fertile ground for cross-examination in this case where we have no physical evidence that ties Mr. Hudson. I don't recall seeing that argument in your brief. I don't recall seeing the argument that Ms. Holliday's inability or unwillingness to pick Mr. Hudson out of the photo array would have been a fertile ground to examine Officer Bailey about in terms of the change in the defendant's appearance. I don't remember that argument. You know, Your Honor, off the top of my head, I don't recall whether that specific point was raised in the brief. I was trying to respond to your question about how cross-examination could have impacted this case if that was not in the brief. I apologize both to this Court and counsel. I can file an amended after we're done here. No, we're not asking you to file an amended brief. Okay. But anyway, that certainly would have been another fertile ground for cross-examination here. And also, this kind of came up during the redirect of Officer Roberts. The State tried to ask Officer Roberts about how old the photos in the array were. So that kind of clued the defense into the fact that this might be an issue down the line. But that would have certainly been fertile grounds for cross-examination. Also, we don't really know the basis on, you know, for example, how Bailey identified Hudson in the video. Was it something about his face? Was it his movement? Was it his posture? You know, we really don't know because, again, the initial identification was based on a video still in this grainy video. So it also would have been fertile grounds for cross-examination for defense counsel to inquire more about this identification and how it was made. So basically, in here, the cross-examination outside of the presence of the jury would have made a significant difference in terms of allowing defense counsel to do a thorough cross in front of the jury. Further, under Thompson, the decision as to whether the law enforcement officer's identification testimony is going to be admissible should not be made until after this cross-examination outside of the presence of the jury has happened because that allows the trial court to make a more informed decision regarding the evidence that will be admitted at trial. Oh, and another point that I forgot to mention is regarding Bailey's prior knowledge of Hudson, I think it's also important to keep in mind that, you know, we're basing this identification on the fact that, oh, Bailey has known Hudson for all these years. He knows him so well, yada, yada, yada. At the time Bailey made the identification, he didn't even know Mr. Hudson's name. He looked at the still and said, I think that guy used to be my neighbor. His name is Buck or Shorty Buck or something like that. So Mr. Bailey is claiming to know this person so well that he can identify them off a grainy video still, but at the same time he doesn't even know this person's name. And I think it's important we keep that in mind when we're evaluating the testimony, the evidence, and the error in this case because it's clear that the trial court didn't comply with the safeguards in Thompson. And the issue for this court to decide is whether that was harmless error or not. And regarding the quality of the video, the state's brief itself acknowledges, implicitly acknowledges the poor quality of the video. The state argues that Bailey's identification was helpful to the jury not only because of his familiarity with Hudson but also because of, quote, the clarity of the recording and the extent to which the defendant is depicted. And, quote, this implicitly acknowledges the poor quality of the video. And it also really underscores how Bailey's testimony was used to connect the dots that the jury couldn't, which was connecting the man at defense table to the man that was on that same video. But you have the victim's testimony, right, as to what happened to her, that she had an adequate opportunity to observe the person who was robbing her, that she identified him in a lineup notwithstanding the fact that she didn't pick his picture out of the photo array. And then you have a video that shows an individual entering the metro station right before the robbery and exiting the station holding what appears to be a person's hand 25 seconds later. Isn't that enough without Bailey? The state didn't decide to, first of all, the state did not decide to try this case without Bailey. So bringing Bailey's testimony in was their decision. And I argue that it was likely made because they did not think that Holiday's testimony was enough. There were certainly multiple weaknesses in Holiday's identification testimony that we raised in the briefs. I'll go through them very quickly. She had a very poor opportunity to view the offender. We know based on the time stamps on the video that the offense took place in less than 30 seconds, and we know that the offender was moving a mask up and down on his face. They gave a remarkably accurate description of him. Her description was very general. The height that she gave was general. The weight that she gave was general. It pretty much matched him. It might have been general. He's 5'10", he's 5'11". I thought he weighed 170 pounds. He weighs 165 pounds. It was pretty accurate, right? It was pretty general, though, and she didn't mention anything specific. For example, we know that Mr. Hudson has a scar on his face, and that scar was never mentioned in any identification descriptions or anything like that. It was not until she identified him in the photo array that she mentioned the scar on his face, and that's significant because she viewed two photo arrays the same day she viewed the lineup. So by the time she views the lineup, this is the third time she's seeing his face that very same day, and that certainly is significant because by the time she views the lineup, of course she recognizes him. She's seen his face multiple times, especially because no one else from the photo arrays appeared in the lineup. Also, right before that lineup, Officer Robertson called her and said, will you come down to the police station because we have the offender in custody. So she's seen two photo arrays, and there's only one person who's in the same photo arrays. Then she goes down and views the lineup. Mr. Hudson is the only person who's been in both of the photo arrays. She's expecting to see the offender. She recognizes Mr. Hudson because she's been seeing him all day, and she identified him. This is certainly extremely suggestive. And this argument was made to the jury? Yes. The suggestiveness of the identification was a significant part of the defense's closing argument, if I'm recalling correctly. There also was over a month between the lineup and the offense, and she didn't know Hudson before the offense, which also we know that that is also a factor where a misidentification is significantly more likely, when one doesn't know the offender. But Ms. Holliday's identification was not that strong because there were all of these issues with her identification. It was really Bailey's testimony that bolstered her identification that really made this case for the jury. Because Bailey came in and said, he basically said, I know the guy in the surveillance video. So he basically told the jury, I know this person, I know this is the defendant, this is the guy. The jury knew that this whole thing lasted about 25 seconds. And the victim, Ms. Holliday, gets on the stand and testifies under oath, I remember seeing his lips, his eyes, I remember the same exact eyes, and he had a scar on his face under his eye, actually. The jury heard all that. Correct. They saw the video. They saw the still shots. Has that been enough? It's not enough because the defense, the cross-examination, Bailey was one of the important witnesses at trial because he really bolstered that identification. But going into trial, defense counsel did not have the information that they need to do a thorough cross of Lieutenant Bailey. Because they didn't have the opportunity to do this cross outside of the presence of the jury so they could get all the ammunition that they needed to meaningfully challenge the state's case. All right. As I understand it, Bailey was not necessarily testifying as a law enforcement officer, although that was his job. When you get on the stand, they say, oh, what's your name, generally where do you live, what do you do for a living, blah, blah, blah. But he was actually testifying more as a neighbor, that he knew the defendant, that he had seen the defendant. Oh, and by the way, I have seen the defendant since I stopped living next to him or two doors away from him a couple years ago. I've seen him 50 years since. But he wasn't allowed to say why he'd seen him. So isn't that to the defendant's benefit at that point? Well, actually, the direct examination of Mr. Bailey was very similar to a standard direct examination of any law enforcement officer. He identified himself as an officer, he gave his experience, and when they asked him how he happened to come to see the video still in the first place, he explained that he was on duty at the Riverdale Police Station, and that day during roll call they were asked to view the video still. So while it may seem to us to be a significant difference, I really don't think the jury would have picked up on that, because he basically testified as he introduced himself as a law enforcement officer, he started talking about his experience as a law enforcement officer, and then he explains how he came to see this still of Mr. Hudson in his capacity as a law enforcement officer. So I think that arguing he was not testifying as a law enforcement officer, particularly bearing in mind that this was a jury trial, not a bench trial, I don't think that that's really a significant distinction for this particular case. That may be different for other cases, but in this case I really don't think that's a significant distinction based on the nature of his testimony. And his status as a law enforcement officer is also important here, because that does give his identification more weight with the jury, because we know that he's a law enforcement officer. There was jury instruction though, right? There was a jury instruction that the testimony of a law enforcement officer should be viewed the same as any other witness. However, there was no jury instruction as mandated by Thompson that the jury was free to disregard Bailey's identification testimony and that they did not need to give any weight to that, or they were not instructed that they should not draw any adverse inferences from the fact that he's a law enforcement officer. Both of those instructions are required by Thompson. And the instruction that the jury is not supposed to give any weight, doesn't have to give any weight to his testimony, that is supposed to be given before the witness testifies and with the jury instructions at the end of trial. And that was not given either time. So the lack of jury instructions also contributes to the prejudice in this case. I will reserve my remaining time for rebuttal. Thank you. Thank you. Mr. Alexander. Good morning. May it please the court. I'm Assistant State's Attorney, Joseph Alexander, on behalf of the people of the state of Illinois. I will attempt to respond to the issues that counsel raised, and if I am not mistaken, she touched on the sufficiency of the evidence in Officer Bailey's opinion testimony. Starting with the first issue, I have to say that defendant's entire argument is based on speculation and conjecture. He has not shown that there was actual error. He has not presented any evidence establishing that there was error. That is his burden. He cannot establish error simply by saying what wasn't done or what could have been done or this might have happened. But the state concedes that it was error not to follow the procedure that Thompson dictated in this circumstance. And before we do, we will concede that in this case the trial court did not give those safeguards. But there is some question as to whether those safeguards were even necessary under Thompson. In this case, the officer was not testifying as a police officer. Those safeguards are for when the officer is testifying pursuant to his job, his or her job, as a police officer. But if he wasn't a police officer, he never would have been in the room for roll call to see the video. That's correct, Your Honor, but that was not essential to this testimony. It was simply to provide context as to how this witness, who happens to be a police officer, saw this photograph to begin with. It wasn't saying that this officer saw this, had contact with this defendant because he was a police officer. If we look at Thompson, the purpose of Thompson when it comes to police officers is to, those safeguards is to prevent the officers from getting into prior bad acts. In this case, the officer didn't get into any prior bad acts. If you look at the officer's testimony, it is consistent with what the court said that testimony from a police officer should be. It should be limited to how this officer knew this person and how many times this officer saw the person. In this case, Officer Thompson testified that he, I'm sorry, Officer Bailey testified that he lived next, he lived in the same area with this defendant. They lived in the same neighborhood. He saw this defendant multiple times. He also testified that he saw the defendant 50 times after they stopped living in that area together. Notice, he didn't testify that he saw him pursuant to his job. He simply said, I saw him 50 times after that. Most importantly, and I think we have to pay adequate attention to this, is he said, I saw this defendant three days before I saw the still images and the video. If we look at Thompson and the cases cited within Thompson, that in and of itself is sufficient for this officer to come in and testify to his opinion. Counsel argued that it's improper for counsel to do that, for a defendant to do that, or an officer to do that because it invades the province of the jury. Thompson actually addressed that. It says that it does not invade the province of the jury because this witness is testifying to something that the jury could have never experienced, and that is interacting with the person depicted in the video in a natural setting. And although this defendant was sitting at counsel's table and the jury saw that, that is not a natural setting. The natural setting is seeing this defendant in the area, seeing this defendant 50 times, seeing this defendant three days prior to viewing the video. Even if this court finds that it was error for the trial court not to give those safeguards, Thompson has held that the harmless error analysis applies. And in this case, the error is harmless. I am going to talk about harmless error and switch between harmless error and reasonable doubt because the evidence is the same. But we all know that harmless error and reasonable doubt are two different standards. But it's still the same evidence. And that evidence is hollow race testimony. This unbelievably accurate identification, this unbelievably accurate description, this positive identification when she saw the defendant as he appeared closer to the night that he robbed her. She was within one inch of his height, five pounds of his weight. She noticed the braids in his hair. She noticed his eye color. She noticed his skin complexion. She also noticed a small scar that he had under his eye. Under any standard, that identification, that description is reliable. And as far as the sufficiency of the evidence, a single eyed witness, if their testimony is positive and credible, if their identification is positive, credible, and reliable, it's sufficient to convict. Now, when we're talking about the sufficiency of the evidence, we are not just limited to the witness's testimony. There was also a video. And that video showed corroborated co-testimony. It showed someone walking into the metro station with a mask on, empty handed. It also showed someone coming out of the metro station approximately 25 seconds later with what appears to be a bag in his hand and a mask on his face. When we talk about the sufficiency of the evidence, this court has to consider all of the evidence in the light most favorable to the people. And that includes any evidence that this court finds was improperly admitted. Because that evidence was before the trial of fact, and that's what they based their decision on. Whether the video is admissible is a separate issue. And as we argued, it was, we believe that the officer's testimony was admissible, him identifying the defendant. The video wasn't admissible. A proper foundation was laid for that under the silent witness rule. Again, to the extent that counsel is arguing what the jury might have inferred, what they might have thought, it's not within our province to, it's not within our ability to invade the province of the jury. It's not in our ability to determine what's in their mind. We can only base our arguments and our decisions on the evidence. And this evidence shows that even if Officer Bailey's testimony was improperly admitted, it wasn't the reason the defendant was found guilty. The reason he was found guilty is because of that positive identification from this victim. To the extent that they argue that this was suggestive, she didn't identify the defendant in the two lineups. The state concedes that, but there is also an explanation for that. As this court will be able to see, those pictures reflect the defendant when he looks younger. And we laid out in our briefs all the differences. His face is thinner, there are no blotches, there's no facial hair, he doesn't have any bags under his eyes. And in the record during the pretrial, they discussed when those pictures were taken. That information didn't come in at trial, but during pretrial and during the sidebar, it was brought to the court's attention that those pictures were from 2001. This case happened in 2012. That's a 10-year difference. When she saw the defendant in the lineup, which took place a month after the incident, not 10 years, she didn't hesitate, she didn't waver, and she maintained that that was the person that robbed her. Was it fair for the state to argue in closing that Ms. Holiday didn't pick Mr. Hudson out of the photo array because she wanted to be sure? Was it fair? Was it a fair inference? It was a fair characterization of the evidence, Your Honor. And what she said was, I didn't pick anybody out because they didn't look like they did in person. Not focusing on any particular person in the photo array. That's correct, Your Honor. So is it fair to say that her mental process was, it might be him, but I need to see him in person? I mean, we get that a lot. It's fair to say that she didn't identify this defendant because he didn't look like the way he did. I would concede that during closing arguments, there wasn't a statement of her testimony. But there was an inference that could be made. And that inference is based on the fact that she didn't say the defendant's not, isn't in that picture. What she said was that they didn't look like what she saw on the night of. And a reasonable inference based on the fact that she didn't say that the defendant wasn't in that picture. And when she saw him at the actual lineup and identified him, that the reason she didn't identify him was because he didn't look like that. And that inference is even more reasonable considering the way he looked in those photo arrays and the way he looked at the time that he was identified by her in the physical lineup. So it's a reasonable inference. I would like to point out, and this is in no way to excuse the State's misstatement, but there was also that type of characterization from the defense. And so what we have in this case is two sides with their theories, with this evidence, characterizing the evidence based on those theories. Neither one was completely inaccurate. But it's a proper characterization based on the evidence. It's a proper inference. So in that light, it wasn't improper for the prosecutor to make those statements. And since we are on that, I'll briefly touch on the other issues within the prosecutor's statement. Again, none of those resulted in substantial prejudice to this defendant, given the overwhelming evidence of his guilt. The fact that the officer didn't live next door to the defendant doesn't change the fact that they live in the same neighborhood. It doesn't change the fact that this officer had seen this defendant multiple times. It doesn't change the fact that the officer saw this defendant three days before he reviewed the video. So those small misstatements, those inadvertent misstatements about they lived not 12 years prior, but 15 years prior doesn't change the fact that he knows this defendant, he's familiar with this defendant, and that was the basis of his opinion testimony, not the proximity of their houses. Based on the arguments we've presented here and the arguments in our brief, we ask that you affirm the defendant's convictions. And I'm sorry I didn't ask if you had any more questions. I just want to ask a couple. The victim, Ms. Holliday, didn't say anything about the scar under his eye or his lips, which are quite distinctive, until the trial. Is that correct? She never said anything about that to the officers when she was being interviewed right after the robbery. I don't believe she said anything. Actually, Your Honor, I do believe she did testify. She testified to the scar. I saw his lips. I saw his eyes. I saw the scar. In court, she testified about that. But the night of the robbery, when she was talking to the police officers who came to talk to her after the robbery, she never mentioned the scar or his lips. Is that correct? Your Honor, I will be perfectly honest with you. I am remembering the testimony, the trial testimony different. I believe Officer O'Neill testified that she did mention the scar in her description to him. And if I am misremembering that, I do apologize. I do have the record with me, and I can. I have the record, too. Okay. Okay. But I do believe that Officer O'Neill testified that when he was being cross-examined by defense counsel about her description, did testify that she did mention the scar. There's only one report from the police officers in the record, and on that report there's nothing that describes the scar or the lips. Oh. But I have another question. Okay. You talked about the foundation for the video. Are you telling us that you think that the Metro officers' testimony that this is a video from the Metro station is enough of a foundation to admit it? Yes. Yes, it is, Your Honor. We need to be careful because what the defendant is doing is conflating admissibility and sufficiency. Whether this video was sufficient to convict on its own, that's a totally separate question. In this case, the issue is whether there was a sufficient indicia of reliability, and in this case there was. This officer, Officer Robertson, testified that he saw the video the first time on June 28th. That's the day after the robbery. And then he was assigned to be the lead detective, lead investigator on the case in July. He then went to the station. Now, there is, it's not clear what station he was referring to. He says station. It could be the police station. It could be the Metro station. But I need to point out that that's the reason this court should honor the defendant's forfeiture of this issue. Because had the defendant made an objection based on foundation, then any ambiguity, any lacking elements could have been cured by the people. But the defendant didn't. By not objecting, the defendant essentially acquiesced to this foundation. And now he's claiming error. That offends all notions of fair play. This court has repeatedly said you cannot acquiesce, you cannot allow error, and then claim that error on appeal. And that is actually what he's doing. So by not objecting, he's forfeited this issue based on those two reasons. Now, before we even get to the substance of this, because when we talk about the silent witness rule, there are five things that, six things, that has to be proven or shown. The device's capability of recording, the competency of the operator, the proper operation of the device. We have that. Because Taylor says if there's a video, if you record it, then that satisfies those first three. And that's based on human experience and common sense. The video wouldn't have recorded if the machine wasn't installed properly, if it wasn't operating properly. So the existence of the video satisfies those three. The fact that there is this ambiguity, there is this confusion as to when he obtained the tape and made the copies, there was a month gap. We don't know where the tape was. There was no testimony to that, as to that fact. But that doesn't defeat admissibility. That goes to wait. That can be, the office can be cross-examined on that. And Taylor and the cases that we cited in our brief did all say that. That goes to wait and not admissibility. Defendant focuses primarily on the copying. The officer testified that he got the tape. He made still images from the video. He made copies of the tape. They're saying that's insufficient because he didn't explain how he did it. Again, even if that is insufficient, it doesn't defeat admissibility. And the fact that he testified that he got the tape from the station, he made still images from it, common sense tells us that in order to take still images from a video, you have to watch the video. So this officer watched the video again, took still images. Then once those images were done, he took the tape, the DVD, and made a copy of it. And that's sufficient to show how he did it. Now, Taylor doesn't say that this officer has to, well, defendant in his brief says, he doesn't talk about the type of software he used, the editing equipment. Taylor doesn't require that. Taylor just requires that we show that this is reliable, this is authentic. This hasn't been edited. This officer testified to his copying, saw the video, and then testified that it's in the same condition as when he first saw the video and when he made the copies. Under Taylor, that is sufficient because, again, this is about admissibility. Any problems with the chain of custody goes to wait. So for those reasons, there was a proper foundation for this. And again, if there were elements lacking, defendant should have objected. And because he didn't object, this is a perfect example of why we have the forfeiture rule. Thank you. Thank you, Mr. Alexander. Ms. Anderson? Thank you, Your Honor. I have a few brief points on rebuttal. First, the State did not argue in its brief that Bailey's testimony should not be considered as law enforcement officer identification testimony because he wasn't an officer that was involved in the investigation. That argument was made for the first time today in this court, and accordingly, it is waived. Second, what we are dealing with here is it's very clear that the safeguards that were outlined in Thompson weren't followed. So the issue is whether that error is harmless. What about Mr. Alexander's point that the purpose of the safeguards in Thompson is to prevent a law enforcement officer who is otherwise familiar with the defendant from talking about prior bad acts? I knew him because I arrested him. I knew him because I saw him dealing drugs. I knew him in all these different contexts. And that didn't happen here. The Court was very careful about that. But Thompson wasn't just limited to that context. Also, that was only one of multiple safeguards that the Illinois Supreme Court specifically mandated in Thompson. Thompson recognizes that law enforcement identification testimony can be inherently prejudicial. And that's why we have these safeguards that we use only with law enforcement officer identification testimony, but not with other identification testimony. So the entire existence of Thompson implicitly acknowledges that this testimony has a likelihood to be unduly prejudicial. That's why we need a separate decision that addresses this. And while they did, in some respects, limit the testimony, they also did not follow some of the more important safeguards that were outlined by Thompson, which were, again, really briefly, cross-examining outside the presence of the jury and those jury instructions. And here, as to the question of whether the failure to follow those safeguards is harmless, it certainly is not. The State discussed Bailey's identification testimony of Hudson in its opening statement, in its closing statement, and its rebuttal closing extensively. And both this Court and the Illinois Supreme Court have explicitly rejected the State's argument that admission of evidence is harmless error when the State relies on... You're not talking about that Bailey's testimony shouldn't have been admitted. It was clearly admissible. You're saying that the error here was in not adopting these safeguards. And the question is whether that is the harmless error, not the admission of the testimony, because clearly he could identify him, right? I think that the error is admitting the testimony without employing the safeguards because the safeguards are designed to protect the defendant from prejudice, thereby protecting his right to a fair trial. So I would argue that the failure to employ the safeguards prior to admitting the testimony is the error that needs to be rectified. Just to be clear, your argument of error is the failure to contemporaneously advise the jury that the testimony of a law enforcement officer identifying a defendant is not to be given any greater weight. It's that error that you say denied him a fair trial. We're saying that the failure to utilize all of these safeguards listed in Thompson is the error. And it includes that jury instruction, but it also includes the opportunity to cross-examine the law enforcement officer outside of the presence of the jury before the law enforcement officer testifies in front of the jury. Because that will allow defense counsel to fully explore any weaknesses in the identification during cross-examination. Also, as to the use of, I want to touch on prosecutorial misconduct very briefly because the State touched on that, and also it does interrelate to the issue of Bailey's testimony here. The State acknowledged in its argument today that the State did misstate Holliday's testimony regarding her certainty of the identification. But by the same token, her testimony was not, I looked at these photographs and he wasn't there. And wasn't that the argument that the defendant made in closing? That is correct. So we've got here kind of two mischaracterizations of what she said. I think it's important to keep in mind, though, that the State misstatement here bolstered Holliday's identification because it created this image of a witness that wanted to be so certain and that's why she didn't make the identification. So it created kind of this false narrative of this super careful witness and that bolstered Holliday's identification. In combination, at the same time, the State also bolstered Bailey's identification during its closing argument by overstating the closeness between Bailey and Hudson. And that's significant because as the State acknowledges in its brief, the Illinois Supreme Court has recognized that identifications become more reliable the more familiar a person is with the one who is being identified. This is part of the reason why we allow that law enforcement identification testimony in the first place. But here what the State did in closing argument was they bolstered Holliday's identification and they also bolstered Bailey's identification. And those are very serious errors in a case such as this where there is no physical evidence whatsoever tying Mr. Hudson to the offense and the State's entire case depends on the credibility of its two identification witnesses. That is what convicted Mr. Hudson was the eyewitness identifications. There was no physical evidence to back that up. So these errors were very serious in this case. You spent a lot of time in your brief talking about Ms. Holliday's identification and what was wrong with it, but you did not offer an expert witness on eyewitness identification. Is that correct? That is correct, Your Honor. Let's see. If there are no more questions, I will conclude my argument. Thank you for your time. Thank you very much. Thank you both for your arguments, excellent arguments here today. Your briefs were excellent as usual as well. We will take the matter under advisement.